# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

Darnell Dunlap,

               Petitioner,      Case No. 14-cv-11537
                                   Hon. Judith E. Levy
v.                                Mag. Judge R. Steven Whalen

Jeffery Woods,

               Respondent.

_____/

**OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS, DENYING A CERTIFICATE OF APPEALABILITY, GRANTING PERMISSION TO APPEAL IN FORMA PAUPERIS, DENYING MOTION TO AMEND ISSUE IV [24], AND DENYING MOTION FOR APPOINTMENT OF COUNSEL [26]**

Petitioner seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner Darnell Dunlap was convicted after a jury trial in the Oakland Circuit Court of second-degree murder. M.C.L. § 750.317. As a result of his conviction, Petitioner was sentenced as a third-time habitual felony offender to a term of twenty-five to forty years.

The petition states seven claims, but Petitioner's first claim is comprised of the three separate claims raised in his direct appeal. The

Court construes the petition as raising the following nine claims: (1) the prosecutor was erroneously allowed to impeach Petitioner with a twenty-five-year old arson conviction, (2) the trial court erred in allowing admission of evidence of prior assaults committed by Petitioner against a third party, (3) Petitioner was denied the effective assistance of counsel for failing to present evidence of the victim's past acts of violence towards Petitioner, (4) insufficient evidence was presented to sustain Petitioner's conviction, (5) trial and appellate counsel were ineffective on numerous other bases, (6) Petitioner's counsel failed to obtain an expert witness, (7) the trial court incorrectly instructed the jury on Petitioner's duty to retreat, (8) trial counsel was physically absent when the jury asked to view the exhibits, and (9) the trial court violated established Supreme Court law in failing to evaluate his ineffective assistance of appellate counsel claim during Petitioner's post-conviction review proceeding.

Petitioner's first three claims are without merit, his remaining claims are barred by his state court procedural default, and the petition will be denied. The Court will also deny Petitioner a certificate of

appealability, but it will grant permission to proceed on appeal in forma pauperis.

## I. Background

Petitioner was convicted of stabbing Marlowe Noland on the evening of October 26, 2008. All facts and testimony contained in this section are derived from the petition (Dkt. 1) and the Rule 5 materials filed by Respondent. (Dkt. 11.)

The evidence presented at trial indicated that Noland and Petitioner had known each other for over twenty years and were close friends who lived in the same house. Their relationship was often tumultuous, however, and they often drank heavily and fought when they became intoxicated.

In 1994, Petitioner suffered severe burn injuries caused by steam when he fell into a manhole in Detroit. Noland and others cared for Petitioner during his recovery. Ultimately, Petitioner received a large monetary settlement related to this injury. Petitioner bought a house, a mobile home, and several cars with the proceeds. He spent much of the rest of his money on trips, casinos, and parties, and by 2008, Petitioner's financial situation had deteriorated.

Noland moved into Petitioner's house with Petitioner and continued to live there until the time of the stabbing. Petitioner's nephew Eric Winston and their friend, Steven Binion, also lived at Petitioner's house.

Petitioner and Noland would often get drunk together. When they did, they used profane language and would insult and threaten each other. In one such instance, months before the stabbing, Petitioner told a friend, "come get this bitch out of my house before I kill him." Although Petitioner often talked about wanting Noland gone, whenever Noland threatened to move, Petitioner relented and urged him to stay.

A month or so before the homicide, Winston witnessed an altercation between Petitioner and Noland where Petitioner threatened Noland with a hammer, holding it over his head as if ready to swing it at him. Winston grabbed the hammer out of Petitioner's hand, and the conflict subsided without further incident.

Noland's brother, Michael Hatcher and another man, Leroy White, testified that they saw Petitioner and Noland–both drunk–together about four days before the stabbing. Hatcher heard Petitioner

4

repeatedly threaten to kill Noland. None of this was particularly unusual, and no one seemed to take Petitioner's threats seriously.

On the night of October 26, 2008, Petitioner, Noland, Binion, and Winston drove around town in Petitioner's vehicle. They visited strip clubs and a friend's house. Over the course of the evening everyone but Winston drank heavily.

Toward the early morning hours, Petitioner and Noland got into an argument, and Petitioner stopped the car on a residential street. Both men were sitting in the front seat. They grabbed each other and exchanged blows. Binion reached forward to try to separate the two men, but Petitioner bit Binion's thumb hard enough to take off the fingernail. Petitioner and Noland continued to argue as they drove to Petitioner's house.

Petitioner pulled in his driveway and stopped. It was after 3:00 a.m., and Winston and Binion immediately exited the vehicle, leaving Petitioner and Noland in the front seat, still arguing. A few minutes later, Petitioner got out of the car holding a bloody knife. Petitioner said he stabbed "Man," which was Noland's nickname. Binion and Winston walked back to the vehicle and looked inside. Noland was slumped in

the front passenger seat and was gasping for air. Winston could not find a pulse; he put his hand on Noland's chest and felt Noland's heart stop beating.

Winston called 9-1-1. During the call, Petitioner got on the phone with the dispatcher, and the tape was played for the jury. During the call, Petitioner admitted stabbing Noland.

Officer Kenneth Ayers and another officer arrived at the scene. The officers asked Petitioner if he stabbed the victim, and Petitioner denied that he had. Paramedics arrived and Noland was pronounced dead at the scene. Petitioner had no visible injuries and bore no signs of being in a struggle. Petitioner did not say he was injured or request any treatment. Binion was taken to the hospital for his injury.

Officer Shannon Robinson responded to the scene at about 3:50 A.M. Robinson removed Petitioner from the back of a Lathrup Village patrol car and placed Petitioner in the backseat of Robinson's patrol car. The two patrol cars were about fifty yards apart. Petitioner had no difficulty walking from one car to the other. Petitioner did not appear to be injured in any way, nor did he complain of any injuries. Petitioner asked what he was going to be charged with, and Robinson told

Petitioner he could talk to a detective about that if he wished. Petitioner said that Noland was going to die anyway because he had problems with his liver.

During booking, Petitioner reached into his mouth, pulled out a tooth, and handed it to the detective. Petitioner claimed that Noland had knocked it out. Dr. Gary Berman, however, an expert in forensic odontology, later examined the broken tooth and opined that in his many years of experience, he had never encountered anyone who had a back molar knocked out by a blow in a fight. A blow severe enough to break a molar would have caused visible injury to the side of Petitioner's face, which was not depicted in Petitioner's booking photos. Dr. Berman theorized that the tooth may have broken when Petitioner bit down on something hard, such as Binion's thumb.

Dr. Patrick Cho, a deputy medical examiner at the Oakland County Medical Examiners Office, performed the autopsy. The cause of Noland's death was a 2½ inch deep stab wound to his chest that punctured his aorta. Dr. Cho testified that such a wound would have required application of some force, consistent with a purposeful act. The knife found at the scene had blood on it, and the size of the knife was

7

consistent with the stab wound. Noland also had two puncture wounds in his ear that were consistent with the knife recovered at the scene. Noland's hands did not show any signs that they had been used to throw punches.

Michael Bowman testified at trial about past incidents in which Petitioner had threatened him with a knife. These incidents all happened before Petitioner's burn accident. The first incident happened in the late 1980s, when Petitioner threatened to cut Bowman with a butcher knife after he had not offered Petitioner a beer. Petitioner told Bowman he was going to stab him and came at him with a butcher knife. Bowman picked up a baseball bat that was sitting nearby and hit Petitioner's arm, causing Petitioner to drop the knife. Petitioner ran upstairs, and Bowman followed him. During the resulting fight, Petitioner bit Bowman on the abdomen, and the scar was still visible at the time of trial.

A second incident happened at Bowman's house in Detroit a few years later. Bowman was arguing upstairs with his girlfriend. Petitioner came in complaining about how Bowman was treating his

girlfriend. Petitioner then pulled out a knife and told Bowman to come outside. This incident ended without any injury.

The defense presented Petitioner's sister Brenda Collins as a witness. Collins testified that in 1994, Petitioner sustained serious injuries when he fell into a manhole. He sustained burns on over 70 percent of his body, and he was in the hospital from October 1, 1994 until February of 1995. Petitioner received a large monetary settlement relating to the burn accident. She further testified that Petitioner spent a lot of the money, and that he financially supported Noland.

When he left the hospital, Petitioner had to use a wheelchair, and Petitioner came to live with Collins. Noland moved in to help take care of Petitioner. After a couple of years of physical rehabilitation, Petitioner was no longer confined to a wheelchair. Nevertheless, Petitioner still had trouble bending his legs at the knees.

Collins testified that in October of 2008, Petitioner still used a walker, although he was able to walk short distances without it. Collins testified that Petitioner was able to walk around inside his house, go up and down stairs, cook for himself, host parties, and dance.

Collins testified that, after he was the victim of a carjacking, Petitioner started to carry a knife in his car. She also testified that Petitioner had a drinking problem, and he and Noland often drank together. When they drank, they both became argumentative. Collins personally saw one brief physical altercation. She also saw them argue while one of them was holding a knife or hammer in his hand.

After Petitioner's arrest in this case, he wrote a letter to Collins urging her to tell Winston and Binion that Noland "jumped" Petitioner.

Petitioner testified in his own defense. Petitioner testified that he is an alcoholic, and he told the jury about his burn injuries and resulting disabilities. Petitioner also testified that in 1997, he was the victim of a carjacking, and broke his leg when he was pulled from his car. After that incident, Petitioner started carrying a knife with him whenever he drove.

Petitioner further testified that he and Noland lived together and were best friends. They often drank together. When they got drunk, Petitioner and Noland frequently argued and called each other names.

On the night of the incident, Petitioner, Noland, Binion, and Winston went to their old neighborhood to visit some friends. They then

10

went to a couple of strip clubs and a laundromat. Petitioner, Noland, and Binion drank throughout that night and were intoxicated.

As they headed home, Noland told Petitioner, "I'm sick of you." Petitioner told Noland, "I'm sick of you too." Petitioner testified that Noland then hit him, and that he pulled over because Noland was hitting him. Petitioner testified that Noland then put his hands around Petitioner's neck and started to choke him. Binion reached up and tried to pull Noland's hands off of Petitioner's neck. Petitioner saw a thumb, which he thought was Noland's, and bit it. Binion started yelling, and then the fight stopped. They headed home, and Petitioner and Noland continued arguing.

Petitioner pulled into his driveway and stopped the car. Binion and Winston got out of the car. Petitioner and Noland stayed in the car and kept arguing. Petitioner testified that Noland hit him, pushed his face up against the driver's side window, and pressed his forearm against the side of Petitioner's neck. Petitioner could not breathe. He testified that when he told Noland he could not breathe, Noland just pressed harder.

Petitioner reached for the knife he kept in the door. Petitioner testified that he only tried to poke Noland so he would let go. He denied that he intended to kill Noland or even hurt him. Petitioner then pushed Noland back into his seat, and Noland was coughing. Petitioner got out of the car, ran to his nephew with a cellphone, and told him to call 9-1-1. Petitioner testified, "I wouldn't never try to hurt him. I loved him just like he was my brother." Petitioner knew he was using a knife but "[i]t was just a poke." Petitioner testified, "I ain't never tried to hurt nobody, never in my life."

On cross examination, Petitioner admitted that he never told the police during his interview that Noland choked him. Petitioner told the police that Noland punched him in the mouth, knocking his tooth out. Petitioner denied ever raising a hammer over his head during a prior argument with Noland.

The prosecutor followed up on Petitioner's statement that he had never tried to hurt anyone. The prosecutor asked Petitioner if he had set fire to an occupied residence in Detroit. Petitioner said he did not set fire to it, but he admitted that he was convicted of attempted arson of a dwelling house.

12

The prosecution called Det. Sgt. David Wurtz of the Oakland County Sheriff's Department as a rebuttal witness. Wurtz testified that he spoke to Petitioner on the day after the incident. Petitioner waived his right to remain silent. Petitioner had no apparent injuries or marks on his face or neck. Petitioner did not indicate that he was injured. Wurtz asked Petitioner what happened, and their conversation lasted about half an hour. Petitioner told a different story to Wurtz than he told in his trial testimony.

During the interview, Petitioner used the word "stabbed" four times when describing what he did to Noland. Petitioner told Wurtz that Noland punched him in the mouth, knocking out his tooth, and Petitioner then reached for his knife and stabbed Noland. Petitioner never said anything during the interview about Noland choking him.

Based on this evidence, following arguments and instructions, the jury found Petitioner guilty of second-degree murder.

Following his conviction and sentence, Petitioner filed an appeal in the Michigan Court of Appeals. He filed a brief through appellate counsel, raising the following two claims:

I. The trial court abused its discretion and [denied] Defendant a fair trial when it permitted the prosecutor to

impeach Defendant with a twenty-five-year-old attempted arson conviction in response to Defendant's testimony that he never in his life tried to hurt anyone.

II. The court abused its discretion and denied Defendant a fair trial when it permitted late endorsement of an other acts witness who was permitted to testify about three separate instances, long in the past, when Defendant threatened the witness with a [knife].

Petitioner also filed a supplemental pro se brief, raising the following claim:

III. Was Defendant denied his Sixth and Fourteenth Amendment rights to due process and the effective assistance of counsel where trial counsel failed to investigate evidence of the victim's alleged physical abuse on several previous [occasions] necessitating Defendant's use of force in self defense?

The Michigan Court of Appeals affirmed Petitioner's conviction in an unpublished opinion. *People v. Dunlap*, No. 293013, 2010 WL 3666713 (Mich. Ct. App. Sept. 21, 2010). Petitioner filed an application for leave to appeal in the Michigan Supreme Court, which raised the same claims. The Michigan Supreme Court denied the application because it was "not persuaded that the questions presented should be

14

reviewed by the Court." *People v. Dunlap*, 793 N.W.2d 699 (Mich. 2011) (Table).

On July 19, 2011, Petitioner returned to the trial court and filed a motion for relief from judgment, raising the following claims:

> I. Defendant's second degree murder conviction must be reversed where the prosecution failed to establish the necessary intent element beyond a reasonable doubt, resulting in a violation of [Defendant's] due process under the US Const Am V and XIV, and the Mich. Const 1963, art 1, § 17.
>
> II. Defendant was denied his Sixth and Fourteenth Amendment right to the effective assistance of counsel where counsel failed to obtain/present available exculpatory evidence.
>
> III. Defendant was denied his Sixth and Fourteenth Amendment right to the effective assistance of counsel where appellate counsel failed to raise the above issues in post-trial appellate proceedings.

With respect to Petitioner's second claim, he alleged that his counsel was ineffective on three grounds: (1) failure to present medical records to show that Petitioner could not have held a hammer over his head as testified to by Winston, (2) failure to present evidence regarding the victim's prior acts of violence towards Petitioner, and (3) failure to

15

present a newspaper article regarding the murder to explain his comments in the telephone call to his sister from jail.

On November 4, 2011, and March 4, 2012, Petitioner filed motions to amend his motion for relief from judgment to add additional issues. The trial court denied the motions by orders dated March 7, 2012, and March 9, 2012, finding that Petitioner was not entitled to amend his motion because of undue delay and futility. (Dkt. 11-17 at 146.)

Petitioner appealed the denial of his motion to amend his motion for relief from judgment, asserting that the trial court abused its discretion in failing to allow him to add his additional claims. The Michigan Court of Appeals denied his application for leave to appeal "for lack of merit in the grounds presented." *People v. Dunlap*, No. 309943 (Mich. Ct. App. Dec. 21. 2012). Petitioner did not appeal this order to the Michigan Supreme Court.  (Dkt. 11-22.)

On July 7, 2012, the trial court denied the motion for relief from judgment under Michigan Court Rule 6.508(D)(3), because Petitioner had not raised the claims on direct appeal, and had not shown good cause or actual prejudice to excuse his failure to do so. (Dkt. 1 at 97-101.) Specifically, the trial court noted that Petitioner filed a pro se

16

supplemental brief during his direct appeal, but he had failed to explain in his motion why he did not raise his new claims in his pro se supplemental brief. The court stated "he apparently chose to forgo his opportunity for direct appellate review of the claims that he now raises in his motion. Thus he has not established 'good cause' for failing to present the issues on appeal." (Id. at 100.)  The trial court denied Petitioner's motion for reconsideration on April 6, 2012.

Petitioner then filed a delayed application for leave to appeal in the Michigan Court of Appeals. The application presented the same claims presented to the trial court, but it also included the additional allegations of ineffective assistance of counsel that the trial court did not permit Petitioner to add to his motion for relief from judgment.

Thus, in additional to the three challenges to counsel raised in the trial court, Petitioner also claimed that his counsel was also ineffective for: (4) failure to conduct a forensic investigation of the knife, (5) failure to present witnesses regarding Petitioner's financial status, (6) failure to present an alibi defense regarding Bowman's claims of prior assaults by Petitioner, (7) failure to investigate prior statements of prosecution witnesses, (8) failure to challenge admission of photographs of

17

Petitioner's vehicle and the crime scene, (9) failure to investigate the 9-1-1 recording, (10) failure to be present in court to respond to the jury request to examine the trial exhibits, (11) failure to investigate the clothing worn by Petitioner and the victim at the time of the incident, (12) failure to challenge the DNA evidence, and (13) failure to obtain an expert witness to see if any of Petitioner's blood could be found on items from the crime scene.

The Michigan Court of Appeals denied the application for leave to appeal for failure to establish entitlement to relief under Michigan Court Rule 6.508(D). *People v. Dunlap*, No. 312783 (Mich. Ct. App. July 8, 2013).

Petitioner applied for leave to appeal this decision in the Michigan Supreme Court, raising the same claims he raised in the court of appeals, but this appeal was also denied under Michigan Court Rule 6.508(D). *People v. Dunlap*, 839 N.W.2d 208 (Mich. 2013) (Table).

## II. Standard of Review

28 U.S.C. § 2254(d), as amended by The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), imposes the following standard of review for habeas cases:

18

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A state court adjudication is "contrary to" Supreme Court precedent under § 2254(d)(1) "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision [of the Supreme Court] and nevertheless arrives at a [different result]." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (internal quotation marks omitted). Under the "unreasonable application" clause of § 2254(d)(1), habeas relief is available if "the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies

19

that principle to the facts of the prisoner's case." *Harris v. Haeberlin*, 526 F.3d 903, 909 (6th Cir. 2008) (internal quotation marks omitted). "In order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous," but rather "must have been 'objectively unreasonable.'" *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003) (citations omitted). Indeed, under the "unreasonable application" clause of § 2254(d)(1),

> even clear error will not suffice. Rather, as a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*White v. Woodall*, ___ U.S. _____ , 134 S. Ct. 1697, 1702 (2014) (citations, quotation marks, and alterations omitted). "When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Woods v. Donald*, ___ U.S. _____, 135 S. Ct. 1372, 1376 (2015). "Federal habeas review thus exists as 'a guard against extreme

malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal.'" *Id.* (quoting *Harrington v. Richter*, 562 U.S. 86, 102-03 (2011)). "[W]hether the trial judge was right or wrong is not the pertinent question under AEDPA." *Renico v. Lett*, 559 U.S. 766, 778 n.3 (2010). The question is whether the state court's application of federal law was "objectively unreasonable." *White*, 134 S. Ct. at 1702. In short, the standard for obtaining federal habeas relief is "difficult to meet . . . because it was meant to be." *Burt v. Titlow*, ___ U.S. _____, 134 S. Ct. 10, 16 (2013)(internal quotation marks omitted).

## III. Analysis

## A. Erroneous Admission of Prior Bad Acts Evidence

Petitioner's first claim asserts that his trial was rendered fundamentally unfair by the admission of evidence related to his conviction of attempted arson of a dwelling house. His second claim challenges the admission of Bowman's testimony regarding their previous violent encounters, occurring many years before the murder. The Michigan Court of Appeals rejected both claims on the merits,

finding that the evidence was properly admitted pursuant to state evidentiary rules.

"Errors by a state court in the admission of evidence are not cognizable in habeas proceedings unless they so perniciously affect the prosecution of a criminal case as to deny the defendant the fundamental right to a fair trial." *Biros v. Bagley*, 422 F.3d 379, 391 (6th Cir. 2006). However, "to show a due-process violation under AEDPA rooted in an evidentiary ruling, there must be a Supreme Court case establishing a due-process right with regard to that specific kind of evidence." *Collier v. Lafler*, 419 Fed. App'x 555, 558 (6th Cir. 2011); *Bugh v. Mitchell*, 329 F.3d 496, 500 (6th Cir. 2003).

Petitioner has pointed to no Supreme Court case that holds that a prosecutor may not present evidence of a prior assaultive conviction–such as attempted arson of a dwelling house–to impeach a defendant's testimony that he had never tried to hurt anyone in his life, and the Court cannot find any such case. With respect to Petitioner's second claim, "[t]here is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence." *Bugh*, 329 F.3d at 512.

22

Petitioner's first two claims therefore cannot form the basis for granting habeas relief under § 2254(d) because there is no Supreme Court case specifically addressing the constitutional limitations regarding the admission of the types of evidence challenged in these two claims. AEDPA therefore bars relief with respect to Petitioner's first two claims.

## B. Defense Counsel's Failure to Present Evidence of the Victim's Violent Acts Toward Petitioner

Petitioner's third claim asserts that his trial attorney was ineffective for failing to present evidence regarding the victim's prior domestic abuse of Petitioner. This claim was presented to the state appellate courts during Petitioner's direct appeal in a supplemental pro se brief. The Michigan Court of Appeals rejected the claim because Petitioner failed to support it with any record evidence and failed to move to expand the record as required by the Michigan Court Rules. (Dkt. 11-13 at 3-4.)

Under state law, when a criminal appellant in Michigan wishes to raise a claim of ineffective assistance of counsel based on facts not contained in the existing record, as here, he must move for a remand to the trial court for an evidentiary hearing. A request for such a hearing

must be accompanied by affidavits or some other offer of proof regarding the evidence the defendant wishes to present. MICH. CT. R. 7.211(C)(1). The Michigan Court Rules require that a request for an evidentiary hearing be made in a separate motion. Id. Alternatively, a criminal defendant may seek to expand the record to support a claim of ineffective assistance of counsel by filing a motion for a new trial while the trial court retains jurisdiction. *People v. Hoag*, 460 Mich. 1, 6 (1999). Petitioner did neither of these things, and instead, his supplemental brief merely alleged that there was evidence of prior assaults. (*See* Dkt. 11-13 at 78-86.)

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court set forth a two-prong test for determining whether a habeas petitioner's counsel was ineffective. First, a petitioner must prove that counsel's performance was deficient. This requires a showing that counsel made errors so serious that he or she was not functioning as counsel guaranteed by the Sixth Amendment. *Id*. at 687. Second, the petitioner must establish that counsel's deficient performance prejudiced the defense. Counsel's errors must have been so serious that they deprived the petitioner of a fair trial. *Id*.

24

The Court's scrutiny of counsel's performance is viewed through a highly deferential lens. *Id*. at 689. Counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Id*. at 690. And it is the petitioner who bears the burden of overcoming the presumption that his counsel's actions constituted sound trial strategy. *Id*. at 689.

To satisfy the prejudice prong under *Strickland*, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is one that is sufficient to undermine confidence in the outcome. *Id*.

Because the state court rejected this claim on the merits, it is beyond the scope of review for this Court to evaluate Petitioner's claim de novo under the *Strickland* standard. The issue here is much narrower: whether the conclusion reached by the state court falls within the bounds of reasonable adjudications of Petitioner's claims — a substantially higher threshold. *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). Indeed, "because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine

25

that a defendant has not satisfied that standard." *Knowles*, 556 U.S. at 123.

When the Michigan Court of Appeals reviewed Petitioner's claims, he had presented no record evidence that the victim had committed acts of violence against him. Rather, the claim was based wholly on Petitioner's unsupported allegations. Petitioner now presents the Court with some records of complaints against Nowland and records of a complaint made in Isabella County to support his claim, but these materials were not part of the record presented to the Michigan Court of Appeals during his direct appeal.

In *Cullen v. Pinholster*, 563 U.S. 170 (2011), the Supreme Court held that where a habeas claim has been decided on the merits in state court, as here, a federal court's review under 28 U.S.C. § 2254(d)(1)— whether the state court determination was contrary to or a involved an unreasonable application of established federal law—must be confined to the record that was before the state court. *Id.* at 181. And here there was simply no record evidence that Petitioner's trial counsel did not take reasonable measures to investigate whether there were prior assaultive acts committed by the victim against Petitioner, or whether

26

such assaultive conduct had occurred at all. Rather, the state court had no record evidence before it at all to support Petitioner's allegations, and he had made no motion to expand the record.

Furthermore, because the state court rejected Petitioner's claim on the merits, this Court is foreclosed under *Cullen* from allowing Petitioner to expand the record here. Counsel is presumed to have rendered effective assistance of counsel under *Strickland*. 466 U.S. at 689. Petitioner bore the burden of demonstrating that counsel performed deficiently by failing to explore this avenue of defense, yet he made no such evidentiary proffer to the state courts during his direct appeal, and he may not present new evidence to support his claim in this action that was not presented to the state court when it adjudicated his claim.

Because Petitioner presented no evidence to the state court to support his claim, the decision by the state court rejecting Petitioner's claim for want of evidence fell "within the bounds of reasonable adjudications of Petitioner's claim[]." *Knowles*, 556 U.S. at 123. Petitioner's counsel was presumptively effective, and Petitioner presented the state courts with no evidence to the contrary.

27

Accordingly, Petitioner cannot demonstrate entitlement to habeas relief with respect to this claim.

## C. Procedurally Defaulted Claims

The remainder of Petitioner's claims were presented to the state courts in his state post-conviction review. Review of these claims is complicated by the fact that the trial court did not allow Petitioner to amend his motion for relief from judgment. Accordingly, only a subset of these claims were fairly presented to the trial court, while the bulk of the claims were presented only to the state appellate courts.

Respondent asserts that review of all of these claims is procedurally defaulted. The Court agrees.

The analysis with respect to the claims properly raised in the trial court and state appellate courts is–as far as habeas law goes–straight-forward.  Michigan Court Rule 6.508(D)(3) provides that a Michigan trial court may not grant relief to a criminal defendant if the motion for relief from judgment alleges grounds for relief that could have been raised on direct appeal, absent a showing of good cause for the failure to raise such grounds previously and to show that actual prejudice resulted. The Michigan Court of Appeals and the Michigan Supreme

Court rejected Petitioner's appeal from the denial of his motion for relief from judgment because "the defendant has failed to meet the burden of establishing entitlement to relief under MCR 6.508(D)."

These orders, however, did not refer to subsection (D)(3), nor did they mention Petitioner's failure to raise these claims on his direct appeal as their rationale for rejecting his post-conviction claims. Because the form orders in this case citing Rule 6.508(D) are ambiguous as to whether they refer to procedural default or a denial of post-conviction relief on the merits, the orders are unexplained. See *Guilmette v. Howes*, 624 F. 3d 286, 291 (6th Cir. 2010). This Court must "therefore look to the last reasoned state court opinion to determine the basis for the state court's rejection" of Petitioner's claims. *Id*.

The trial court, in rejecting Petitioner's post-conviction claims, indicated that Petitioner failed to satisfy the "good cause" requirement under Rule 6.508(D)(3) for failing to raise his claims during his appeal of right. Such reliance on Rule 6.508(D)(3) was "an adequate and independent state ground" on which the state can rely to foreclose federal habeas review. *Amos v. Renico*, 683 F.3d 720, 733 (6th Cir. 2012).

29

When a state court clearly and expressly relies on a valid state procedural bar, as here, federal habeas review is barred unless the habeas petitioner can demonstrate "cause" for the default and actual prejudice as a result of the alleged constitutional violation, or if he can demonstrate that failure to consider his defaulted claims will result in a "fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750-51 (1991). If a petitioner fails to show cause for his procedural default, it is unnecessary for the court to reach the prejudice issue. *Smith v. Murray*, 477 U.S. 527, 533 (1986).

Petitioner alleges ineffective assistance of appellate counsel as cause to excuse his failure to raise these claims on direct appeal. This assertion  ignores the fact that Petitioner filed a pro se supplemental brief during his direct appeal that raised an ineffective assistance of counsel claim but failed to raise the claims he raised in his motion for relief from judgment and in his motions to supplement.

It was Petitioner's inability to explain this failure that prompted the trial court to find that Petitioner had failed to satisfy the requirements of Rule 6.508(D)(3). The trial court specifically noted that Petitioner had taken the opportunity to file a pro se supplemental brief

30

during his direct appeal, but omitted his post-conviction claims from the brief. Because Petitioner has offered no reason for his failure to include any of his post-conviction claims in his pro se supplemental brief on direct appeal, he has failed to establish cause to excuse the default. *See McCray v. Curtin*, 2013 U.S. Dist. LEXIS 121561, 26-27 (E.D. Mich. Aug. 27, 2013); *Rockwell v. Palmer*, 559 F. Supp. 2d 817, 834 (W.D. Mich. 2008)(habeas petitioner did not show cause for his failure to raise on direct appeal his claim of ineffective assistance of trial counsel, where petitioner had filed two briefs on his own behalf raising other claims that had not been asserted by his appellate counsel, but he offered no explanation for his failure to raise the ineffective assistance claim at the same time).

In any event, Petitioner has failed to show that his appellate counsel was ineffective for failing to raise his post-conviction claims in his direct appeal. The Sixth Amendment guarantees a defendant the right to the effective assistance of counsel on the first appeal by right. *Evitts v. Lucey*, 469 U.S. 387, 396-397 (1985). However, it is well established that a criminal defendant does not have a constitutional right to have appellate counsel raise every non-frivolous issue on

appeal. See *Jones v. Barnes*, 463 U.S. 745, 751 (1983). The Supreme Court has explained:

> For judges to second-guess reasonable professional judgments and impose on appointed counsel a duty to raise every "colorable" claim suggested by a client would disserve the . . . goal of vigorous and effective advocacy. . . . Nothing in the Constitution or our interpretation of that document requires such a standard.

*Id.* at 754.

Moreover, a "brief that raises every colorable issue runs the risk of burying good arguments — those that, in the words of the great advocate John W. Davis, 'go for the jugular,' — in a verbal mound made up of strong and weak contentions." *Id.* at 753.

Strategic and tactical choices regarding which issues to pursue on appeal are "properly left to the sound professional judgment of counsel." *United States v. Perry*, 908 F.2d 56, 59 (6th Cir. 1990). In fact, "the hallmark of effective appellate advocacy" is the "process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail." *Smith*, 477 U.S. at 536 (quoting *Barnes*, 463 U.S. at 751-752). "Generally, only when ignored issues are clearly stronger than those presented will the presumption of effective assistance of appellate

32

counsel be overcome." *Monzo v. Edwards*, 281 F.3d 568, 579 (6th Cir. 2002).

Appellate counsel may deliver deficient performance and prejudice a defendant by omitting a "dead-bang winner," which is defined as an issue which was obvious from the trial record and would have resulted in a reversal on appeal. *Meade v. Lavigne*, 265 F. Supp. 2d 849, 870 (E.D. Mich. 2003).

Petitioner fails to show that appellate counsel's performance fell outside the wide range of professionally competent assistance by omitting the claims that he raised in his post-conviction motion. Petitioner's appellate counsel raised two claims on appeal, and though they proved to be without merit, Petitioner has failed to show that any of his post-conviction claims are obvious from the trial record, as important as those that were raised by his appellate counsel, and that would have resulted in a reversal on appeal.

The claims Petitioner attempted to raise on post-conviction review in his motions to amend and supplement his motion for relief from judgment are procedurally barred from review for a different reason. Because the trial court denied the motions to add the claims, he never

33

properly placed these claims before the state courts for review as required by the exhaustion requirement. See 28 U.S.C. § 2254(b)(1); *Garcia-Medina v. McKee*, 2014 U.S. Dist. LEXIS 40266, *56 (W.D. Mich. Jan. 17, 2014)(claims raised in rejected motion to amend motion for relief from judgment considered unexhausted).

Absent certain, limited circumstances not present here, Petitioner was permitted to file "one and only one motion for relief from judgment . . . with regard to [his] conviction." MICH. CT. R. 6.502(G). Thus, at this juncture, Petitioner has no way to exhaust the claims he wished to add to his motion for relief from judgment and no available remedy. The result is that the claims are barred from review in this action. This creates what amounts to a no-win situation for petitioner, but the rule in such a case is that "[i]f the claims presented in the federal court were never actually presented in the state courts, but a state procedural rule now prohibits the state court from considering them, the claims are considered exhausted, but are procedurally barred." *Cone v. Bell*, 243 F.3d 961, 967 (6th Cir. 2001).

The fact that Petitioner attempted to present these additional claims to the state appellate courts does not change the analysis. There

34

is a "longstanding rule in Michigan that 'issues that are not properly raised before a trial court cannot be raised on appeal absent compelling or extraordinary circumstances.'" *People v. Cain*, 498 Mich. 108, 114 (2015)(quoting *People v. Grant*, 445 Mich. 535, 546 (1994)). Claims never presented to a state-post conviction court are deemed procedurally defaulted on federal habeas review. *Fautenberry v. Mitchell*, 515 F.3d 614, 635 (6th Cir. 2008).

Petitioner counters Respondent's argument that these claims are defaulted by asserting that Rule 6.502(F), the rule the trial court relied upon to deny his motions to add the issues, was not firmly established or regularly followed, and therefore cannot form the basis for the imposition of a procedural default. This is incorrect. It is true that a court must consider whether the "adequate and independent state procedural bar . . . [was] 'firmly established and regularly followed' by the time as of which it [was] to be applied." *Ford v. Georgia*, 498 U.S. 411, 424 (1991). The question, however, is only "whether, at the time of the petitioner's actions giving rise to the default, the petitioner could . . . be deemed to have been apprised of the rule's existence." *Fautenberry*, 515 F.3d at 641 (further citation omitted). Rule 6.502(F) states in plain

35

language that a court *may* permit a defendant to amend or supplement a motion for relief from judgment. It does not suggest that a defendant has any automatic right to add claims months after he has already filed his post-conviction proceeding. Petitioner was apprised of the rule's existence at the time he filed his motion for relief from judgment and even though he is pro se, he cannot justifiably claim surprise at the trial court's decision to deny his motion to add additional issues.

Finally, assuming that Petitioner had established cause for his default, he would be unable to satisfy the prejudice prong of the exception to the procedural default rule because his claims are without merit. The cause and prejudice exception is conjunctive, requiring proof of both cause and prejudice. See *Matthews v. Ishee*, 486 F. 3d 883, 891 (6th Cir. 2007). For the reasons stated by Respondent in its answer to the petition, Petitioner has failed to show that any of his defaulted claims have merit.

One final exception to the procedural default rule, known as the "fundamental miscarriage of justice" exception, allows review of defaulted claims if the petitioner can show that the constitutional errors he alleges have probably resulted in the conviction of one who is

actually innocent. *Bousley v. United States*, 523 U.S. 614, 623 (1998). In order to be entitled to the actual-innocence exception, however, a petitioner must present "new and reliable evidence that was not presented at trial" that "show[s] that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt." *Schlup v. Delo*, 513 U.S. 298, 299 (1995).

It is not sufficient to show merely that the evidence raises a reasonable doubt that did not otherwise exist. *See id*. at 329 ("The meaning of actual innocence . . . does not merely require a showing that a reasonable doubt exists in light of the new evidence, but rather that no reasonable juror would have found the defendant guilty."). "Actual innocence," according to the Supreme Court, "means factual innocence, not mere legal insufficiency." *Bousley*, 523 U.S. at 623.

Nothing Petitioner has provided the Court comes close to demonstrating his actual innocence. This case involved a claim of self-defense or accident during an altercation. The prosecution presented witnesses and evidence indicating that Petitioner purposefully stabbed the victim to death with a knife. Petitioner attempted to claim that the homicide was accidental or that the stabbing was performed in self

37

defense, but this theory was belied by Petitioner's changing story about how he was attacked. Prior to trial he claimed he was punched in the mouth hard enough to lose a tooth, but after this theory was countered by the dental expert, Petitioner for the first time alleged that he was being choked. Petitioner's meager new evidence of prior assaults by the victim and other materials he alleges his attorney should have presented at trial does not convince the Court that he is actually innocent. Accordingly, his claims are procedurally barred from review, and the Court denies review of his defaulted claims.

## IV. Certificate of Appealability

In order to appeal the Court's decision, Petitioner must obtain a certificate of appealability. To obtain a certificate of appealability, a prisoner must make a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). To demonstrate this denial, the applicant is required to show that reasonable jurists could debate whether the petition should have been resolved in a different manner, or that the issues presented were adequate to deserve encouragement to proceed further. *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000). A federal district court may grant or deny a certificate of appealability

when the court issues a ruling on the habeas petition. *Castro v. United States*, 310 F.3d 900, 901 (6th Cir. 2002).

Here, jurists of reason would not debate the Court's conclusion that Petitioner has not met the standard for a certificate of appealability because his claims are completely devoid of merit or clearly barred by his state court procedural default. The Court will therefore deny a certificate of appealability.

The Court will, however, grant permission to appeal in forma pauperis because any appeal of this decision could be taken in good faith. 28 U.S.C. § 1915(a)(3).

## V. Conclusion

Accordingly, the Court 1) **DENIES WITH PREJUDICE** the petition for a writ of habeas corpus, 2) **DENIES** a certificate of appealability, 3) **GRANTS** permission to appeal in forma pauperis, and 4) **DENIES** Petitioner's motion to amend Issue IV (Dkt. 24) as moot.

The Court further denies Petitioner's motion for appointment of counsel (Dkt. 26), as counsel in habeas cases may only be appointed "in exceptional cases . . . where a petitioner has made a colorable claim, but lacks the means to adequately investigate, prepare, or present the

claim." *Lemeshko v. Wrona*, 325 F. Supp. 2d 778, 788 (E.D. Mich. 2004)

(citing *Johnson v. Howard*, 20 F. Supp. 2d 1128, 1129 (W.D. Mich.

1998)).  Petitioner has not made a colorable claim in this petition.

IT IS SO ORDERED.

Dated: April 21, 2016             s/Judith E. Levy
Ann Arbor, Michigan               JUDITH E. LEVY
                                  United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on April 21, 2016.

                                  s/Felicia M. Moses
                                  FELICIA M. MOSES
                                  Case Manager